UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LEROY G. INSKEEP, not individually but as Trustee for Griffin Trading Company, Inc., | ) ) ) | No. 10 C 1915 |
| | ) | |
| Plaintiff/Appellant, | ) | Judge Ruben Castillo |
| | ) | |
| v. | ) | |
| | ) | |
| FARREL J. GRIFFIN and ROGER S. GRIFFIN, | ) | |
| | ) | |
| Defendants/Appellees. | ) | |

## MEMORANDUM OPINION AND ORDER

After Griffin Trading Company ("Griffin Trading") filed for Chapter 7 bankruptcy, the bankruptcy trustee, Leroy G. Inskeep, ("Trustee") brought an adversary complaint against Farrel J. Griffin and Roger S. Griffin (collectively, "Defendants"), Griffin Trading's directors and sole shareholders. The adversary complaint alleged, *inter alia*, that Defendants breached the fiduciary duties they owed to their creditors. (R. 1, Appeal R. at 29-30.) Although a bankruptcy court initially ruled in favor of the Trustee on his breach of fiduciary duty claim, its ruling was subsequently vacated and remanded. *See Inskeep v. Griffin*, No. 05 C 1834, 2008 WL 192322, at *13 (N.D. Ill. Jan. 23, 2008). On remand, the bankruptcy court ruled in favor of Defendants. *See In re Griffin Trading Co., Inc.*, 418 B.R. 714, 726 (Bankr. N.D. Ill. 2009). Presently before the Court is the Trustee's appeal from the bankruptcy court's second ruling. For the reasons stated below, the Court affirms the bankruptcy court's judgment.

# RELEVANT FACTS

## I.  Background

Defendants were the directors and sole shareholders of Griffin Trading Company, a futures commission merchant.  (Bankr. R. 86, Joint Pretrial Statement, Stip. ¶¶ 1-8.)  The Commodities Exchange Act defines a futures commission merchant as an entity that: "(A) is engaged in soliciting or in accepting orders for the purchase or sale of any commodity for future delivery on or subject to the rules of any contract market or derivatives transaction execution facility; and (B) in or in connection with such solicitation or acceptance of orders, accepts any money, securities, or property (or extends credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom."  7 U.S.C. § 1a(20).  During the relevant time period, Griffin Trading had its headquarters in Chicago, along with a branch office in London.  (Bankr. R. 86, Joint Pretrial Statement, Stip. ¶ 2.)

A future is a standardized contract to purchase ("go long") or to sell ("go short") the subject matter of the contract on a future date ("the delivery date") at a price agreed upon at the time the contract is entered into.  (R. 13, App., Ex. 8 at 7.)  Futures contracts may be settled by delivery of the underlying subject matter on the delivery date.  (*Id.*)  In the vast majority of cases, however, futures contracts are settled by entering into an equal and opposite transaction; the settlement price will be a payment between the parties of the difference between the contract price and the price for the subject matter on the delivery date.  (*Id.*)  The difference between the contract price and the price on the delivery date represents a profit or a loss on the transaction.  (*Id.*)

Futures traders act through brokers–specifically, futures commission merchants– who are

members of a commodities exchange. (*See* R. 13, App., Ex. 1 at 49.) These members can either be clearing or non-clearing members of an exchange. (*See id.*, Ex. 8 at 12.) When a trader places an order to make a trade, his or her broker executes the trade by forming a contract with another broker. (*See id.*, Ex. 8 at 49-50.) Details of the trade are then submitted to the exchange's clearing house by both the buying and selling broker. (*Id.*, Ex. 8 at 12.) The exchange clearing house subsequently attempts to match up the details of the trade for registration. (*Id.*) Once the trade details are matched, the trade is accepted by the exchange's clearing house. (*Id.*) After acceptance or, as it is also known, clearance of the trade, the transaction is registered and the original contract between the buying and selling broker is novated so that the exchange's clearing house becomes the counterparty to both the buyer and seller. (*Id.*) In other words, after registration, two parallel contracts are created: one between the clearing house and the purchaser clearing member, and another between the clearing house and the buyer clearing member. (*Id.*) Upon clearance, each of the original counterparties no longer carries the risk of the other original counterparty's default; instead, they are in a contractual relationship only with the clearing house. (*Id.*) Importantly, only a clearing member of an exchange may submit trades to that exchange's clearing house. (*Id.*) If a customer's broker is not a clearing member of an exchange, the broker must submit its customer's trades through a clearing member. (*Id.*)

By virtue of their contractual relationship with the clearing house, clearing members bear principal financial responsibility for the cleared trade. This contractual relationship, however, is only the beginning of the chain of liability. (*See id.*, Ex. 8 at 13.) Where a non-clearing member utilizes a clearing member to clear a trade on an exchange, the non-clearing member becomes liable to the clearing member. (*See id.*) To recover for its liability, the non-clearing member

3

looks to the futures trader for reimbursement. (*See id.*) In contrast, where a clearing member enters into an agreement directly on behalf of a futures trader, the former looks to the latter for payment. (*See id.*)

To reduce their financial exposure, exchanges require clearing members to deposit funds, which are called the "margin." (*Id.*) For a similar reason, clearing and non-clearing members of an exchange will, in turn, require their customers to maintain margin funds in their customer trading accounts. (*Id.*) There are two types of margin payments: (1) an initial margin payment, which is essentially a good faith deposit made to ensure performance under the contract and is paid at the time the contract is entered into; and (2) a variation margin call, which may be required when the clearing member has shown a loss on the day's trading. (*Id.*, Ex. 8 at 13-14.)

## II. The events of December 1998

Beginning on Monday, December 21, 1998 and continuing into the morning of Tuesday, December 22, 1998, John Ho Park ("Park"), a trader who operated out of Griffin Trading Company's London office, substantially exceeded his trading limits and suffered losses. (*Id.*, Ex. 8 at 17; Ex. 1 at 89-90.) During these two days, Park executed a series of trades in German Bund futures contracts on the Eurex exchange using the execution services of another broker, Tullet & Tokyo Futures and Trades Options ("Tullet"). (*Id.*, Ex. 8 at 17.) Because Griffin Trading was not a clearing member of Eurex, it used MeesPierson N.V. ("MeesPierson") as its clearing broker for these trades. (*See* Bankr. R. 86, Joint Pretrial Statement, Stip. ¶¶ 4-6.) Unfortunately, Park suffered losses when overnight changes in the market rendered his trading positions unprofitable. (R. 13, App., Ex. 1 at 91.) Pursuant to the previously described chain of liability, Eurex first looked to MeesPierson for any margin call or payment in settlement of Park's realized losses.

4

(*See* Bankr. R. 86, Joint Pretrial Statement, Stip. ¶ 6.) MeesPierson, in turn, looked to Griffin Trading for payment. (*See id.*) Finally, Griffin Trading requested payment from Park. (*See id.*) At the time of the relevant transactions, Park did not have sufficient funds on deposit with Griffin Trading to pay the losses suffered by his unprofitable trading. (*Id.* ¶ 13.) Additionally, Griffin Trading did not have the funds needed to cover the losses incurred by Park. (*Id.*)

Griffin Trading's London office first became aware of Park's losses on the morning of December 22. (*Id.*, Ex. 8 at 19.) That same morning, MeesPierson issued a margin call for 5 million Deutsche Marks ("DM") (equivalent to approximately £1.8 million), a large part of which was to cover the initial margin on Park's December 21 trades. (*Id.*) According to banking conventions, where instructions for a foreign currency transaction are given to a bank after 9:30 a.m., the transaction will be for value the next day. (*Id.*) Thus, because the MeesPierson margin call was received after 9:30 a.m. on December 22, its payment would be due on December 23.

On the morning of December 22, the first two of four transactions occurred in response to the MeesPierson margin call. (*Id.*, Ex. 8 at 19; Ex. 1 at 128-29.) First, at 11:19 a.m. GMT, Griffin Trading's London office transferred £1.61 million from Griffin Trading's account at the London Clearing House to its account at the Bank of Montreal. (*Id.*) Next, £1.6 million were immediately transferred from Griffin Trading's Bank of Montreal account to its account at Credit Lyonnais Rouse Limited. (*Id.*) The following day, at 11:51 a.m. GMT, the funds were converted into DM 5 million and sent back to the Bank of Montreal. (*Id.*) Finally, at 11:52 a.m. on December 23, DM 5 million were transferred from the Bank of Montreal to MeesPierson's bank in Germany, Commerzbank. (*Id.*; Ex. 4 at 44.)

Farrel Griffin arrived at the Chicago office between 12:00 and 1:00 p.m. GMT (6:00-7:00

5

a.m. Chicago time) on December 22, over half an hour after the initial movement of funds. (*Id.*, Ex. 2 at 6.) It was upon his arrival to the office that Farrel Griffin first learned of Park's losses. (*Id.*, Ex. 1 at 108-11.) In response to the information he received regarding these losses, Farrel Griffin called Roger Griffin and spoke with him on a conference call throughout the day. (*Id.*) That day, Farrel Griffin took a series of additional steps in response to this information, including transferring customer accounts to other futures commodities merchants, contacting the Board of Trade's Office of Investigation and Audit, and calling his attorney. (*Id.*, Ex. 1 at 149-50.) According to Farrel Griffin, he was not aware of the MeesPierson margin call, and thus did not ask any of his employees about its status, nor did he issue any orders stopping any wire transfers.[1] (*Id.*, Ex. 1 at 131, 137, 170, 217.)

## PROCEDURAL HISTORY

As a result of Park's losses, Griffin Trading became insolvent. (*Id.*, Ex. 8 at 3.) On December 30, 1998, Griffin Trading filed a Chapter 7 bankruptcy petition, and Leroy G. Inskeep was appointed as the Chapter 7 trustee. (Bankr. R. 86, Joint Pretrial Statement, Stip. ¶ 15.) Approximately three years later, on January 2, 2001, the Trustee filed a five-count adversary complaint against Defendants. (R. 1, Appeal R. at 25-32.) At issue in this appeal is Count IV, which alleges that Defendants breached the fiduciary duties owed to their customers by, *inter alia*, failing to monitor Park's trading on December 21 and 22, and transferring approximately $2.6 million of customer funds to MeesPierson after they "knew or should have known that

---

[1] In addition to the original DM 5 million margin call, MeesPierson issued a subsequent margin call of DM 13.5 million on December 22 to cover the growing losses suffered as a result of Park's trading positions. (R. 13, App., Ex. 8 at 20.) Griffin was unable to pay this amount, and therefore did not transfer any funds. (*Id.*)

[Griffin Trading] would be unable to satisfy the claims of customer creditors." (*Id.* at 29-30.)

Prior to trial, the bankruptcy court completely resolved all counts in the adversary complaint except for Count IV. (*Id.*, Ex. 26 at 1-2.) With respect to Count IV, the bankruptcy court granted partial summary judgment in favor of the Trustee on June 30, 2004. (*Id.*, Ex. 25 at 1-2.) Specifically, it found that: (1) on and after November 2, 1998, Griffin Trading Company was insolvent, unreasonably undercapitalized, and unable to pay its debts as they matured; and (2) on account of such insolvency, Defendants owed fiduciary duties as officers to Griffin Trading Company's creditors, including its customers. (*Id.*)

The bankruptcy court held a one-day bench trial on September 27, 2004 to resolve the two remaining issues pertaining to Count IV: (1) whether the Defendants breached their fiduciary duties; and (2) whether these alleged breaches proximately caused the damages claimed by the Trustee. (*Id.*, Ex.1 at 1; Ex. 26 at 2.) On January 26, 2005, it issued an oral opinion in which it ruled in favor of the Trustee. (*Id.*, Ex. 2 at 1-11.) In this ruling, the bankruptcy court made several key factual findings and legal conclusions. First, contrary to Defendants' testimony, it found that Defendants knew about the funds transfer to MeesPierson while there was still time to stop it. (*Id.*, Ex. 2 at 9.) The bankruptcy court further held that not only did Defendants know about the wire transfer, but, pursuant to Uniform Commercial Code ("U.C.C.") Section 5/4 A-211(b), were legally allowed to "abort the wire transfer up until the time that the money was actually transferred." (*Id.*, Ex. 2 at 9-10.) In sum, the bankruptcy court found that Defendants' failure to stop the wire transfer used to pay the first MeesPierson margin call constituted both gross negligence and a breach of their fiduciary duties. (*Id.*, Ex. 2 at 10.) Specifically, it noted that the "transfer of money to [MeesPierson] should not have been made and was in violation of

the applicable statutes and regulations" which prevented Griffin Trading from using a customer's money to margin or guarantee the trades of another person. (*Id.*, Ex. 2 at 8-10 (citing 7 U.S.C. § 6d and 17 C.F.R. § 1.20).) Rather than fulfilling their "clear duty . . . to take steps to stop the payment before their bank executed the transfer," the bankruptcy court found that Defendants "took no action to prevent the transfer in spite of the fact that it[] [was] clear that the transferred funds came from monies held by the company on behalf of other customers from the company." (*Id.*, Ex. 2 at 9.) In addition, it concluded that the wire transfer was the proximate cause of the damages alleged. (*Id.*) Later that day, the bankruptcy court entered judgment in favor of the Trustee in the amount of the wire transfer, $2,985,074.63, plus prejudgment interest. (*Id.*, Ex. 29.)

After filing an unsuccessful Rule 59(e) motion to amend the judgment, (*see* Bankr. R. 106, Defs.' Mot. to Am.; R. 112, Bankr. Ct. Order), Defendants appealed the bankruptcy court's ruling. (Bankr. R. 113, Notice of Appeal.) On January 23, 2008, the Court, in a proceeding presided over by the Honorable Mark R. Filip, issued a ruling vacating the bankruptcy court's judgment and remanding the case for further proceedings. *Inskeep*, 2008 WL 192322, at *13. In its opinion, the Court highlighted the somewhat conclusory analysis provided by the bankruptcy court in its oral ruling with respect to the issue of causation. *Id.* at *4. Given the minimal treatment by the bankruptcy court of the factual and legal questions that would determine Defendants' ability under the U.C.C. to cancel the funds transfer, the Court found that it would be prudent "to remand to the bankruptcy court for analysis of whether the Trustee established revocability under Article 4A of the Illinois U.C.C." *Id.* at *13.

Approximately four months later, on May 29, 2008, the Commodity Futures Trading

8

Commission ("CFTC") filed a brief in which it sought to assist the bankruptcy court's decision on remand. (Bankr. R. 155, CFTC Br.) In its brief, the CFTC noted that "contrary to the [bankruptcy court's] January 2005 decision, 7 U.S.C. § 6d and 17 C.F.R. § 1.20 do not apply to trading on foreign exchanges." (*Id.* at 6.) Rather, it noted that those provisions apply only to customer funds placed with futures commodities merchants for trading on domestic exchanges. (*Id.*) The CFTC then noted that it had issued specific regulations—which are codified at 17 C.F.R. § 30.7—that apply to futures commodities merchants who trade on foreign boards of trade. (*Id.*)

On July 30, 2008, the bankruptcy court issued a preliminary pretrial order in which it outlined the scope of a limited trial that would address two issues: (1) causation, specifically, "whether the law allowed [D]efendants to abort the wire transfer"; and (2) if Defendants were found liable, the extent of damages allegedly suffered by Griffin Trading's customers. (*Id.*, Ex. 31 ¶ 6.) In addition, the bankruptcy court vacated its prior oral ruling to the extent it was inconsistent with the Court's January 2008 opinion. (*Id.*, Ex. 31 ¶ 1.) Specifically, it vacated its "conclusion of law regarding segregation of customer accounts being governed by 7 U.S.C. § 6d and 17 C.F.R. § 1.20." (*Id.*) Further, it also vacated "the mixed conclusion of law and fact that 'the law allowed the defendants to abort the wire transfer up until the time that the money was actually transferred.'" (*Id.*) Finally, the bankruptcy court vacated the legal conclusion that "the amount of the transfer was the amount of damage to the estate." (*Id.*)

On January 29, 2009, the bankruptcy court issued a decision regarding the law to be applied during the trial. (*Id.*, Ex. 32 at 7.) In its decision, the bankruptcy court concluded that: (1) "Illinois Uniform Commercial Code Article 4A, § 211(b) [would] apply to the issue regarding

the Defendants' ability to stop the wire transfer"; and (2) with respect to the issue of damages, "the segregation of customer accounts [would] be governed by 17 C.F.R. § 30.7 because the earlier ruling that the law governing the segregation of customer accounts is 7 U.S.C. § 6 and 17 C.F.R. § 1.20 was erroneous." (*Id.*)

The second bench trial in the adversary proceeding was held on July 13, 2009. (*Id.*, Ex. 4 at 1.) On October 30, 2009, the bankruptcy court entered judgment in favor of Defendants. (R. 14, App., Ex. 33 at 19.) In doing so, the bankruptcy court found that the Trustee failed to carry his burden with respect to the two remaining issues. First, it concluded that the Trustee failed to carry his burden of proving causation because he did not show "whether and when banks in the chain accepted" any payment orders. *In re Griffin Trading Co., Inc.*, 418 B.R. at 720. Without "evidence of any communications between the banks," the bankruptcy court found that the Trustee did not "carr[y] his burden of proving the necessary element of causation by a preponderance of the evidence." *Id.* at 720-21. Second, because he failed to prove that any of the funds transferred were from accounts that should have been segregated under 17 C.F.R. § 30.7, the bankruptcy court found that the Trustee did not carry his burden with respect to damages. *Id.* at 721-26. The Trustee asked the bankruptcy court to amend its ruling on both issues in a motion for reconsideration filed on November 18, 2009.[2] (Bankr. R. 248, Mot. to Am.) The bankruptcy court subsequently denied the Trustee's motion. (Bankr. R. 273, Order denying Mot. to Am.) On February 12, 2010, the Trustee appealed the bankruptcy court's

---

[2] Under the Federal Rules of Civil Procedure, there is technically no such thing as a motion for reconsideration. *Talano v. Nw. Med. Faculty Found., Inc.*, 273 F.3d 757, 760 n.1 (7th Cir. 2001). Accordingly, the Court will refer to this motion as a motion to amend the judgment.

ruling.[3] (Bankr. R. 275, Notice of Appeal.)

The Trustee makes several arguments in urging the Court to reverse the bankruptcy court's decision. First, he argues that the Court erroneously vacated and remanded the first bankruptcy court decision. (R. 12, Tr.'s Br. at 26-30.) Specifically, he contends that the Court "erred when it concluded, based upon a skeletal argument made on appeal, that Defendants might not have been able to stop the wire transfer of money out of their own account and therefore remand was appropriate on the issue of causation." (*Id.* at 26.) Second, the Trustee asserts that the bankruptcy court was mistaken when it concluded that he failed to prove causation under Article 4A. (*Id.* at 30-40.) Next, he argues that the bankruptcy court mistakenly allowed the CFTC to intervene and expand the issues it considered on remand. (*Id.* at 40-42.) Additionally, the Trustee maintains that the bankruptcy court erred when it concluded that he had not proven damages. (*Id.* at 42-49.) Finally, he argues that the bankruptcy court erred when it denied his motion to amend the judgment. (*Id.* at 49-50.)

## LEGAL STANDARD

In the course of a district court's review of a bankruptcy court order, "[f]indings of fact . . . shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." *Mungo v. Taylor*, 355 F.3d 969, 974 (7th Cir. 2004) (quoting Fed. R. Bankr. P. 8013). Thus, "a bankruptcy court's factual findings cannot be disturbed simply because [the district court] is convinced it would have

---

[3] This appeal was previously consolidated with a cross-appeal (No. 10 C 2248) filed by Defendants related to the bankruptcy court's denial of certain costs. (*See* Bankr. R. 281, Mem. Op.; Bankr. R. 281, Not. of Appeal; R. 11, Min. Entry.) On July 2, 2010, the cross-appeal was dismissed pursuant to Defendants' unopposed motion to dismiss. (R. 27, Min. Entry.)

decided the case differently." *Id.* (internal quotation marks and citations omitted). Both questions of law and mixed questions of law and fact, however, are reviewed *de novo*. *Id.* (citation omitted).

## ANALYSIS

### I. The Court's prior ruling

As a threshold matter, the Trustee argues that the Court previously erred by remanding the bankruptcy court's first decision. (R. 12, Tr.'s Br. at 26-30.) According to him, Judge Filip mistakenly remanded the case on the issue of causation by considering an "argument that was never made in the Bankruptcy Court and was only made [to him] in a reply brief." (*Id.* at 28.) Specifically, the Trustee contends that this "skeletal" argument–which involved Defendants' ability under the U.C.C. to cancel the "wire transfer"–was waived, and thus should not have been considered by the Court in its prior decision. (*Id.* at 26-29.) As a result of the purportedly mistaken consideration of this argument, the Trustee asks the Court to reconsider its prior decision and reinstate the bankruptcy court's initial ruling which found in his favor. (*Id.* at 30.) Because the Trustee is requesting the unsettling of a prior decision, the Court must consider the law of the case doctrine.

The authority of a district court judge to reconsider a previous ruling in the same litigation–whether a ruling made by him or by a district judge previously presiding in the case–is governed by the law of the case doctrine. *Santamarina v. Sears, Roebuck & Co.*, 466 F.3d 570, 571-72 (7th Cir. 2006). The law of the case doctrine "embodies the notion that a court ought not to revisit an earlier ruling absent a compelling reason." *Minch v. City of Chi.*, 486 F.3d 294, 301 (7th Cir. 2007). "This presumption against reopening matters already decided reflects interests in

consistency, finality, and the conservation of judicial resources, among others." *Id.* (citation omitted). "In situations where a different member of the same court re-examines a prior ruling, 'the law of the case doctrine . . . reflects the rightful expectation of litigants that a change of judges midway through a case will not mean going back to square one.'" *Mendenhall v. Mueller Streamline Co.*, 419 F.3d 686, 691 (7th Cir. 2005) (quoting *Best v. Shell Oil Co.*, 107 F.3d 544, 546 (7th Cir. 1997)).

The Seventh Circuit has stated that the presumption created by this doctrine has greater force when there is a change of judges during litigation and a new judge is asked to revisit the rulings of a predecessor. *HK Sys., Inc. v. Eaton Corp.*, 553 F.3d 1086, 1089 (7th Cir. 2009). Although the new judge may alter prior rulings, he or she is not free to do so merely because of a different view of the law or facts from the predecessor judge. *Best*, 107 F.3d at 546. Rather, the new judge may revisit a prior ruling if there is a compelling reason to do so, such as a manifest error or a change in the law. *Minch*, 486 F.3d at 301. Where a litigant claims that the predecessor judge erred, the new judge "should depart from the [predecessor] judge's decision only 'if he has a conviction at once strong and reasonable that the earlier ruling was wrong, and if rescinding it would not cause undue harm to the party that had benefitted from it." *Gilbert v. Ill. State Bd. of Educ.*, 591 F.3d 896, 902 (7th Cir. 2010) (citations omitted).

Here, the Trustee does not claim there has been a change in the law that would warrant revisiting the Court's prior ruling. (*See* R. 12, Tr.'s Br. at 26-30.) Instead, the basis for reconsideration set forth by the Trustee relates to Judge Filip's supposedly mistaken reliance on contentions the Trustee claims were waived because they were "never made in the Bankruptcy Court, and [were] only made [to Judge Filip] in a reply brief." (*Id.* at 28.) The Trustee

13

specifically highlights the U.C.C. arguments set forth by Defendants in their reply brief presented to Judge Filip in which they contend that the Trustee presented no evidence that the wire transfer could have legally been cancelled.[4] (*Id.* at 28-29.) The Court finds that the record undermines the Trustee's waiver argument.

To begin, the Court notes that Defendants did raise the argument regarding their ability to cancel the wire transfer prior to the first appeal. (*E.g.*, R. 14, App., Ex. 28, Defs.' Resp. to Tr.'s Post-Trial Brief at 1 ("[The Trustee] presented zero evidence that [D]efendants could have reversed the wire transfer. This evidentiary vacuum renders that portion of Count IV unsustainable because even if [D]efendants should have known of the wire transfer, there is no evidence that, having such knowledge, [D]efendants should or could have reversed the wire transfer.").) The Trustee pounces on Defendants for not specifically relying upon the U.C.C. in making their arguments before the bankruptcy court, but his reliance on this fact is misplaced. It is the Trustee who has the burden of proving causation, and thus it was his responsibility to identify and apply the operative legal framework necessary to prove causation. Because the Trustee invokes the U.C.C. for the first time in his post-trial reply brief, (*compare* Bankr. R. 101, Tr.'s Post-Trial Reply Br. at 5 *with* Bankr. R. 93, Tr.'s Post-Trial Br. at 33 n.7), Defendants' failure to present any U.C.C. arguments before the bankruptcy court is understandable. Given the Trustee's belated consideration of the U.C.C. in attempting to prove causation, the Court finds that Defendants sufficiently raised the issue of whether they could have reversed the funds

---

[4] Throughout this opinion, the Court will use the terms "funds transfer" and "wire transfer" interchangeably, as U.C.C. Article 4A suggests that the two terms are synonymous. *See* 810 Ill. Comp. Stat. 5/4A-102 (Official Cmt.). Thus, in understanding the meaning of the term "wire transfer" the Court will look to the definition of the term "funds transfer" provided at 810 Ill. Comp. Stat. 5/4A-104(a).

transfer before the bankruptcy court.

Moreover, the Trustee's reliance on the briefing during the first appeal to support his waiver argument is similarly unpersuasive. Although he is correct in noting that Defendants' U.C.C. argument was not fully developed until their reply brief, (*compare id.*, Ex. 36, Defs.' Br. at 12 *with* Ex. 38, Defs.' Reply at 10-13), Judge Filip's consideration of this argument was not improper.[5] The Trustee had, and took advantage of, an opportunity to address the U.C.C. issues in his response brief. (*See id.*, Ex. 37, Tr.'s Br. at 29-33.) Contrary to what he suggests, the Trustee was not deprived of an opportunity to address the relationship between the U.C.C. and Defendants' ability to cancel the wire transfer. (*See id.*) Because both sides addressed them in their briefs, the U.C.C. issues were not waived, and were therefore properly before Judge Filip.

In short, the Court finds that Judge Filip did not improperly consider waived arguments. Without a mistake by Judge Filip, the Court cannot identify a compelling reason that overcomes the presumption against revisiting prior rulings. Accordingly, the Court concludes that the law of the case doctrine mandates the rejection of the Trustee's efforts to disturb the Court's prior ruling.

## II.    The bankruptcy court's causation determination

The Trustee argues that the bankruptcy court's causation determination was the product of a misapplication of U.C.C. Article 4A. (R. 12, Tr.'s Br. at 35.) He specifically maintains that the bankruptcy court committed two errors. (*Id.*) First, he contends that the bankruptcy court

---

[5] In his opening brief, the Trustee indicates that the U.C.C. arguments were "only" made in a reply. (R. 28, Tr.'s Br. at 28.) This characterization is belied both by other portions of his brief (*id.* at 27, 29 (stating that these arguments were only "fully" or "mainly" made in Defendants' reply brief )), and by the record in this case.

erred "when it demanded more proof than was necessary and concluded that without evidence of the written communications between the banks it could not apply Article 4A." (*Id.*) Second, he asserts that the "additional evidence the Bankruptcy Court stated that it needed was not legally necessary." (*Id.* at 37.) Prior to examining the bankruptcy court's application of U.C.C. Article 4A, the Court finds that it would be prudent to first present background information explaining the basis for liability and Article 4A.

### A. Breach of fiduciary duty

The remaining basis for liability against Defendants is an alleged breach of fiduciary duty. Specifically, the Trustee avers that Defendants breached their fiduciary duties by "[t]ransferring customer funds to [MeesPierson] after the Defendants knew or should have known that [Griffin Trading] would be unable to satisfy the claims of customer creditors." (Bankr. R. 86, Joint Pretrial Statement at 3.) To prevail on his breach of fiduciary duty claim, the Trustee must prove, *inter alia*, that Defendants' actions (or inaction) caused damages.[6] In light of the previous rulings in this case, the only remaining issue that must be resolved to determine liability is causation. With respect to this issue, the Court must determine whether Defendants were able to cancel the funds transfer. As stated by Judge Filip, "if the funds transfer at issue was irrevocable at the point in time that Defendants became aware of the transfer, then no liability could attach based

---

[6] The parties have agreed to this proposition throughout this litigation. (*See* Bankr. R. 86, Joint Pretrial Statement at 2 (stating that to prevail the Trustee must prove "that such breach proximately caused the damage of which the Trustee complains.").) According to the parties, to prevail on a claim for breach of fiduciary duty, the Trustee must prove: "(1) that Defendants were officers and directors of the Debtor; (2) that the Debtor was insolvent or within the zone of insolvency, and, thus, the Defendants' respective fiduciary duties ran in favor of creditors of the Debtor; (3) that the Defendants' actions or failures to act breached their duties of good faith, due care, or loyalty; and (4) that such breach proximately caused the damage of which the Trustee complains." (*Id.*)

on their subsequent failure to reverse the (then-irreversible) transfer that had already been initiated." *Inskeep*, 2008 WL 192322, at * 7. In other words, if any attempt by the Defendants to cancel the funds transfer would have been barred by Article 4A, then their failure to act did not cause the damages–indeed, the harm would have taken place with or without any attempt by Defendants to revoke. Thus, to determine if the Trustee has carried his burden on the issue of causation, the Court must examine whether Defendants could have cancelled the funds transfer. Prior to doing so, however, the Court will present the relevant terms and definitions that logically precede any discussion of how Article 4A applies to the facts in this case.

## B.     Relevant U.C.C. provisions

Article 4A governs a specialized method of payment that is referred to as a funds transfer, or, as it is commonly known in the commercial community, as a wholesale wire transfer. 810 Ill. Comp. Stat. 5/4A-102 (Official Cmt.). Illinois law defines a funds transfer as "the series of transactions, beginning with the originator's payment order, made for the purpose of making payment to the beneficiary of the order. The term includes any payment order issued by the originator's bank or an intermediate bank intended to carry out the originator's payment order. A funds transfer is completed by acceptance by the beneficiary's bank of a payment order for the benefit of the beneficiary of the originator's payment order." 810 Ill. Comp. Stat. 5/4A-104(a). A funds transfer may "encompass a series of payment orders that are issued in order to effect the payment initiated by the originator's payment order." 810 Ill. Comp. Stat. 5/4A-104 (Official Cmt. #1).

A payment order is "an instruction of a sender to a receiving bank, transmitted orally, electronically, or in writing, to pay, or to cause another bank to pay, a fixed or determinable

17

amount of money to a beneficiary[.]" 810 Ill. Comp. Stat. 5/4A-103(a)(1). A payment order is

issued "when it is sent to the receiving bank." 810 Ill. Comp. Stat. 5/4A-103(c). For each

payment order there is a sender and a receiving bank. A sender is "the person giving the

instruction to the receiving bank." 810 Ill. Comp. Stat. 5/4A-103(a)(5). A receiving bank is the

"bank to which the sender's instruction is addressed." 810 Ill. Comp. Stat. 5/4A-103(a)(4).

An understanding of the labels affixed to each of the parties involved in a funds transfer

is critical in determining how a payment order can be cancelled. For the present purposes, five

labels must be defined: (1) originator; (2) originator's bank; (3) intermediary bank; (4)

beneficiary's bank; and (5) beneficiary.[7] An originator is the "sender of the first payment order

in a funds transfer." 810 Ill. Comp. Stat. 5/4A-104(c). The originator's bank is either "(i) the

receiving bank to which the payment order of the originator is issued if the originator is not a

bank, or (ii) the originator if the originator is a bank." 810 Ill. Comp. Stat. 5/4A-104(d). An

intermediary bank is a "receiving bank other than the originator's bank or the beneficiary's

bank." 810 Ill. Comp. Stat. 5/4A-104(b). A beneficiary's bank is the "bank identified in a

payment order in which an account of the beneficiary is to be credited pursuant to the order or

which otherwise is to make payment to the beneficiary if the order does not provide for payment

to an account." 810 Ill. Comp. Stat. 5/4A-103(a)(3). Finally, a beneficiary is the "person to be

paid by the beneficiary's bank." 810 Ill. Comp. Stat. 5/4A-103(a)(2).

Illinois law also establishes the method by which an issued payment order may be

cancelled. Specifically, it provides that a "communication of the sender of a payment order

---

[7] A bank is a "person engaged in the business of banking and includes a savings bank, savings and loan association, credit union, and trust company. A branch or separate office of a bank is a separate bank for purposes of [Article 4A]." 810 Ill. Comp. Stat. 5/4A-105(a)(2).

cancelling or amending the order may be transmitted to the receiving bank orally, electronically, or in writing." 810 Ill. Comp. Stat. 5/4A-211(a). The requirements for an effective cancellation of a payment order depend on whether the receiving bank has accepted the payment order. Where the bank has not accepted the payment order, "a communication by the sender cancelling or amending a payment order is effective to cancel or amend the order if notice of the communication is received at a time and in a manner affording the receiving bank a reasonable opportunity to act on the communication before the bank accepts the payment order." 810 Ill. Comp. Stat. 5/4A-211(b). "After a payment order has been accepted, cancellation or amendment of the order is not effective unless the receiving bank agrees or a funds transfer system rule allows cancellation or amendment without agreement of the bank." 810 Ill. Comp. Stat. 5/4A-211(c).

The requirements for an effective cancellation depend, as mentioned above, on acceptance. How a payment order is accepted, in turn, is contingent upon the type of receiving bank. A "receiving bank other than the beneficiary's bank accepts a payment order when it executes the order." 810 Ill. Comp. Stat. 5/4A-209(a). An order is executed by a non-beneficiary receiving bank "when it issues a payment order intended to carry out the payment order received by the bank." 810 Ill. Comp. Stat. 5/4A-301(a).

The rules for acceptance differ for a beneficiary's bank, which accepts at the earliest of the following times:

> (1)     when the bank (i) pays the beneficiary as stated in Section 4A-405(a) or 4A-405(b), or (ii) notifies the beneficiary of receipt of the order or that the account of the beneficiary had been credited with respect to the order unless the notice indicates that the bank is rejecting the order or that the funds with respect to the order may not be withdrawn or used until receipt of payment from the sender of

the order;

(2)　　when the bank receives payment of the entire amount of the sender's order pursuant to Section 4A-403(a)(1) or 4A-403(a)(2); or

(3)　　the opening of the next funds transfer business day of the bank following the payment date of the order if, at that time, the amount of the sender's order is fully covered by a withdrawable credit balance in an authorized account of the sender or the bank has otherwise received full payment from the sender . . .

810 Ill. Comp. Stat. 5/4A-209(b).[8]

A payment order received by the beneficiary's bank can be accepted but cannot be executed. 810 Ill. Comp. Stat. 5/4A-301(a). Acceptance of a payment order cannot occur before the order is received by the receiving bank. 810 Ill. Comp. Stat. 5/4A-209(c). With the relevant U.C.C. provisions and definitions in hand, the Court now turns to considering whether the Trustee carried his burden of showing that Defendants were legally permitted to cancel the wire transfer.

## C.　Revocability of the funds transfer under the U.C.C.

Before turning to the substantive legal issues involved in this appeal, the Court will first briefly address the standard of review. In their brief, Defendants state that the court must review for "clear error the bankruptcy court's finding that the trustee offered no proof of 'what the banks communicated to each other and ultimately to MeesPierson–and when." (R. 26, Defs.' Br. at 19-20 (quoting *In re Griffin Trading Co., Inc.*, 418 B.R. at 720).) To the extent this statement suggests that the Court's review of the bankruptcy court's finding regarding the Trustee's failure

_____

[8] A "funds transfer business day" of a receiving bank is defined as the part of a day during which the receiving bank is open for the receipt, processing, and transmittal of payment orders and cancellations and amendments of payment orders. 810 Ill. Comp. Stat. 5/4A-105(a)(4).

to satisfy his burden is reviewed for clear error, Defendants are mistaken. Because it involves a determination on whether the facts in this case satisfy the applicable legal standard, the bankruptcy court's conclusion regarding whether the Trustee has met his burden of proving causation is a mixed question of law and fact. *Cf. In re Ebbler Furniture and Appliances, Inc.*, 804 F.2d 87, 89 (7th Cir. 1986) (stating that an examination of the manner in which factual conclusions implicate a legal definition is a mixed question of fact and law). Accordingly, the Court reviews the bankruptcy court's decision *de novo. See Mungo*, 355 F.3d at 974.

The Trustee asserts that the bankruptcy court misapplied Article 4A by requiring more proof than was necessary to show that Defendants were legally permitted to cancel the funds transfer. (R. 12, Tr.'s Br. at 35.) According to him, the evidence in this case establishes that Defendants were legally permitted to stop the wire transfer before the funds left Griffin Trading's control. (*Id.*) As the foundation of his argument, the Trustee restates the following undisputed facts regarding the timing of certain transactions: (1) at 11:19 a.m. GMT on December 22, £1.61 million from Griffin Trading's account at the London Clearing House was transferred to its account at the Bank of Montreal; (2) £1.6 million were immediately transferred from Griffin Trading's Bank of Montreal account to its account at Credit Lyonnais Rouse Limited; (3) at 11:51 a.m. GMT on December 23, the funds were converted into DM 5 million and sent back to the Bank of Montreal; and (4) at 11:52 a.m. GMT on December 23, the DM 5 million were transferred from the Bank of Montreal to Commerzbank. (*Id.* at 32-33.) Building from this foundation, the Trustee argues that for the first three transactions, Griffin Trading was both the originator and beneficiary. (*Id.* at 33.) As a result, he contends that "[a]t any point during any of these transfers, [Griffin Trading] could have stopped the transfer, either under § 4A-211(b) by

contacting sender/originator bank in its capacity as the sender/originator and instructing it not to execute the payment order or by agreeing with itself in its capacity as the beneficiary to cancel the transfer under § 4A-211(c) and notifying its beneficiary bank to send the money back."[9] (*Id.*) Put simply, the Trustee argues that because the undisputed facts establish that the funds were in accounts controlled by Griffin Trading from approximately 11:19 a.m. GMT on December 22 to 11:52 a.m. GMT on December 23, Defendants were legally permitted to prevent the funds from being transferred to Commerzbank. (*See, e.g., id.* at 38.) Thus, the Trustee concludes that the bankruptcy court erred in finding that he had not satisfied his burden of proving that Defendants could have stopped the funds transfer.

The Trustee's argument has some intuitive appeal. The undisputed facts establish that the funds were in Griffin Trading-controlled accounts until 11:52 a.m. on December 23. (Bankr. R. 233, Joint Pretrial Statement at 28-29.) It therefore seems to make sense that, up until the money left an account controlled by Griffin Trading, Defendants could have prevented the funds from being transferred to Commerzbank. While intuitively sound, this argument is insufficiently moored to U.C.C. Article 4A. To determine whether the funds transfer could have been cancelled, the focus of the Court's analysis must be on the related concepts and definitions contained in U.C.C. Article 4A. An overview of how the relevant U.C.C. analysis would theoretically proceed reveals the fundamental defect in the Trustee's position identified by

---

[9] Defendants suggest that this argument was waived by the Trustee because it "surfaced for the first time in the [T]rustee's reply brief in his motion to reconsider." (R. 26, Defs.' Br. at 21-22.) The Court disagrees. This argument has been preserved for appeal, as the Trustee made essentially the same argument in his proposed findings of fact and conclusions of law submitted before the second trial. (Bankr. R. 230, Tr.'s Proposed Findings of Fact and Conclusions of Law, ¶¶ 50-53.)

bankruptcy court: the absence of payment orders.

First, the Court would have to consider the funds transfer and the number of payment orders involved. *See* 810 Ill. Comp. Stat. 5/4A-104 (Official Cmt. 1, Case #2) (providing a hypothetical where two payment orders were issued in a funds transfer). For each payment order, the Court would then need to examine whether Defendants could have cancelled it. In engaging in this analysis, the Court would have to determine whether, when, and how a payment order could have been cancelled, which would in turn require an examination into whether, when, and how the receiving bank accepted. *See* 810 Ill. Comp. Stat. 5/4A-211(b). To figure out whether a bank accepted a payment order, the Court would have to determine whether the bank is a beneficiary or non-beneficiary bank. *See* 810 Ill. Comp. Stat. 5/4A-209(a)-(b). If a non-beneficiary receiving bank is involved, acceptance is achieved through the issuance of a "payment order intended to carry out the payment order received by the bank." *See* 810 Ill. Comp. Stat. 5/4A-209(a); 810 Ill. Comp. Stat. 5/4A-301(a). If, on the other hand, a beneficiary receiving bank is involved, a different set of acceptance methods are set forth at 810 Ill. Comp. Stat. 5/4A-209(b). Thus, the foundational question the Court would have to answer before considering the methods of acceptance and, relatedly, the issue of cancellation, is whether a bank is a non-beneficiary receiving bank versus a beneficiary receiving bank. To answer this important question, the Court would have to consider payment orders. *See* 810 Ill. Comp. Stat. 5/4A-103(a)(3) ("'Beneficiary's bank' means the bank identified in a *payment order* in which an account of the beneficiary is to be credited pursuant to the *order* or which otherwise is to make payment to the beneficiary if the *order* does not provide for payment to an account.") (emphasis added).

Taking these related concepts and definitions into consideration, the Court finds that the Trustee has failed to provided any persuasive evidence or arguments establishing that the bankruptcy court erred. There are two primary reasons why the Court has concluded that the Trustee has failed to carry his burden of showing that the Defendants were able to cancel the funds transfer. First, the Court notes that throughout this litigation, the Trustee has taken the mistaken position of conflating payment orders with the movement of funds. (*See, e.g.*, R. 12, Tr.'s Br. at 36 (arguing that he provided evidence of the necessary communications between the banks by providing "documents showing to the minute when the funds moved between the [London Clearing House], [Bank of Montreal], [Credit Lyonnais Rouse], and Commerzbank accounts").) As Judge Filip observed, "a payment order is not necessarily a payment–it is a communication from a sender to a bank, instructing that bank to pay another party." *Inskeep*, 2008 WL 192322, at *9. Despite this helpful observation, the Trustee has continued to predicate his arguments on the movement of funds (and the control of banks accounts) as opposed to the payment orders that were presumably issued by the parties involved in these transactions. Both the statutory definition of a payment order, along with the official comments to the U.C.C., draw a distinction between the actual payment of funds, which involves the movement of funds between institutions, and the underlying instruction to make payment. *E.g.*, 810 Ill. Comp. Stat. 5/4A-104 (Official Cmt. #1) ("Article 4A governs a method of payment in which the person making payment (the 'originator') directly transmits an *instruction* to a bank either to *make payment* to the person receiving payment (the 'beneficiary') or to *instruct* some other bank to *make payment* to the beneficiary.") (emphasis added). The Court finds that the Trustee's arguments fail to fully appreciate this distinction.

24

This conceptual error may have led to the Trustee's second mistake: his failure to provide any evidence of payment orders. In his brief, the Trustee's primary contention is that the bankruptcy court "erred when it demanded more proof than was necessary and concluded that without evidence of the written communications between the banks it could not apply Article 4A." (R. 12, Tr.'s Br. at 35.) This contention is flawed for two reasons. First, it misstates the bankruptcy court's ruling, which did not require "written communications." *See In re Griffin Trading Co., Inc.*, 418 B.R. at 720-21 ("The record does not contain evidence of any communications between the banks."). Second, it fails to properly consider Article 4A's language. As stated above, payment orders are necessary to determine the labels affixed to the various parties involved in the funds transfer(s). Based on the language of the U.C.C., labeling these parties is more than merely an academic exercise–it determines both when and how a bank accepts a payment order, which, in turn, necessarily informs the revocation analysis. Thus, as discussed below, the proof the bankruptcy court required was not the product of a misapplication of U.C.C. Article 4A. The Trustee's arguments to the contrary are unavailing.

In asking the Court to reverse the bankruptcy court's determination, the Trustee relies heavily upon the conclusion that Griffin Trading was the "beneficiary" for each of the first three "transfers."[10] (*See, e.g.*, R. 12, Tr.'s Br. at 33.) Indeed, his arguments are contingent upon accepting the premise that Griffin Trading and its banks served as the beneficiary and beneficiary's bank, respectively. (*See id.* at 37-39.) He fails, however, to provide any evidence

---

[10] This argument also appears to assume that the London Clearing House is a bank for purposes of the U.C.C. analysis. While the Court is uncertain whether a clearing house can be considered a bank under 810 Ill. Comp. Stat. 5/4A-105(a)(2), this point does not warrant much attention, as it does not affect the central legal questions on appeal.

establishing the existence of any payment orders. In the absence of evidence of any payment orders, the Court cannot determine what types of banks (*i.e.*, which banks were originator banks? beneficiary banks? intermediary banks?) were involved in the various payment orders that must have been issued to pay MeesPierson. Without any substantiated sense of what role these banks played in these payment orders, the Court cannot determine whether, when, and how they accepted, and, importantly, whether, when, and how Defendants could have cancelled the payment orders.

To fill this evidentiary gap, the Trustee contends he has presented "sufficient unrebutted evidence about what the banks communicated to each other and when." (*Id.* at 36; *see also* R. 28, Tr.'s Reply at 9.) After reviewing this evidence, the Court concludes that it merely documents the movement of funds. (*See* R. 14, App., Exs. 21-23.) The records the Trustee relies upon

reveal nothing about the underlying payment orders.[11]  Although the Trustee attempts to excuse

the absence of this critical evidence by emphasizing the burden of proof, (R. 12, Tr.'s Br. at 36-

37), his effort is unconvincing.  Proof by a preponderance of the evidence does not excuse the

absence of evidence that is necessary to conduct the relevant U.C.C. analysis, nor does it allow

the Trustee's *ipse dixit* to substitute as evidence.  Contrary to the Trustee's argument that the

bankruptcy court required him to "prove every conceivable fact that might exist in support of

[his] position or to disprove every conceivable negative fact in order to prove [his] position," (*id.*

at 37), a fair reading of its ruling shows that it was merely requiring the Trustee to provide

evidence of payment orders that are essential to determining whether, under Article 4A,

Defendants could have cancelled the funds transfer.  The Court finds that such a demand is in

harmony with Article 4A.

---

[11]  One of the records the Trustee directs the Court's attention to is Trustee's Exhibit 38. (R. 28, Tr.'s Reply at 9.)  This document appears to be a Bank of Montreal report chronicling the inflow and outflow of DM 5 million from Griffin Trading's account on December 23, 1998. (*See* R. 14, App. Ex. 23 at 4.)  The Court's review of this document reveals two interesting points. First, a handwritten notation on the report suggests some uncertainty regarding when the Bank of Montreal received the underlying instructions related to the payment of DM 5 million. (*See id.* (containing handwritten notation placed directly below an entry documenting to the outflow of DM 5 million to what appears to be MeesPierson which asked: "When did we receive the instructions[?]").)  Second, this page in the report also contains an ambiguous notation at the bottom suggesting that Bank of Montreal may have received an instruction on December 22 to pay on December 23. (*See id.*)  Given that the transaction between Bank of Montreal, MeesPierson, and Credit Lyonnais Rouse Limited is the only transaction on that particular page involving December 23, (*see id.*), it is possible that the dates referred to in the handwritten notations pertain to the movement of funds between these three institutions.  While certainly not dispositive of any of the issues in this case, the Court highlights this document to emphasize: (1) the distinction between payment orders and the movement of funds; and (2) the importance of those payment orders (one of which may have been issued and accepted sometime on December 22) in conducting a well-grounded analysis of whether, when, and how certain banks accepted and, importantly, whether, when, and how Defendants could have cancelled certain payment orders.

The bankruptcy court found that the Trustee failed to carry his burden on the issue of causation because there was "simply no evidence of any payment orders." *In re Griffin Trading Co., Inc.*, 418 B.R. at 718. Upon reviewing the record in conjunction with the applicable law, the Court arrives at the same conclusion. In the absence of any evidence of payment orders, the Court does not know if, when, and how Defendants could have cancelled the payment orders that were presumably issued to pay MeesPierson. Given this uncertainty, the Court cannot conclude that the Defendants' failure to act caused the losses alleged by the Trustee. In short, it was the Trustee's burden to show that Defendants could have cancelled the funds transfer, and they failed to do so. Accordingly, the Court affirms the bankruptcy court's determination on the issue of causation.[12] As a result of the Trustee's failure to satisfy an element of the basis for liability, the Court finds it unnecessary to delve into the related issues of damages and CFTC intervention. Since it relates to the issue of damages, it is also unnecessary to consider the Trustee's request that the Court review the bankruptcy court's denial of its motion to amend the judgment.

## CONCLUSION

For the reasons set forth above, the bankruptcy court's judgment in favor of Defendants is AFFIRMED.

---

[12] In his reply brief, the Trustee reasserts an argument he has presented on prior occasions. Put simply, he contends that the issue of causation was established during the first trial when Farrel Griffin "admitted . . . that [Defendants] could have and would have stopped the MeesPierson wire transfer if they had known about it." (R. 28, Tr.'s Reply at 12-13.) Even assuming that Farrel Griffin provided such an admission regarding his ability to cancel the funds transfer, the Court finds that such a statement holds no legal significance, and is therefore certainly not dispositive on the issue of causation. A witness' testimony expressing his subjective belief regarding whether the law permitted a particular act does not, of course, establish the lawfulness of said act.

Entered:

Judge Ruben Castillo
United States District Court

**Dated:** October 19, 2010